IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN E. CLEVENGER and       :       No. 1:06-CV-1006
CAROL L. CLEVENGER,         :
                            :       JUDGE SYLVIA H. RAMBO
         Plaintiffs         :
                            :
         v.                 :
                            :
CNH AMERICA, LLC,           :
                            :
         Defendant          :

**M E M O R A N D U M**

Before the court is a motion for new trial made by Plaintiffs John and
Carol Clevenger.  They filed suit against Defendant CNH America, LLC (referred to
as "Case"), for strict products liability.  They alleged that the Case 85XT skid steer
loader was defectively designed because a safety interlock system failed to prevent
the machine from injuring Mr. Clevenger as he exited its cab.  The jury, after a four-
day trial, found that the design of the 85XT was not defective.  For the reasons that
follow, Plaintiffs' motion for new trial will be denied.

I.       **Background**

         A.       **Facts**

         The parties being familiar with the details of this case, the court sets
forth only those facts necessary to address this motion.  On February 25, 2005, Mr.
Clevenger was working on his farm.  He decided to clear recently fallen snow from
the area around his driveway and barn.  He climbed into his Case 85XT skid steer
loader to use it as a snow plow.

         A skid steer loader is a compact, maneuverable machine for use on a
farm.  It has a cab containing a seat for the operator.  It has arms on either side of the
cab that hold a plow-type bucket in front of the cab.  Because the lift arms are placed

directly next to the cab, the operator must enter and exit the 85XT from the front of the cab, climbing over the bucket.  The arms and bucket move in response to two hand-control levers.  The arms are raised and lowered by moving the left hand control lever to the right or left.  The tilt of the bucket is governed by the right hand control lever.  The controls on the 85XT are designed to automatically spring back to neutral once pressure upon them is released.  The operator must move between the controls when entering and exiting the cab.

The seat within the cab has a lap bar that can be raised and lowered. After sitting down, the operator pulls the lap bar down.  Once the lap bar is down and the engine is turned on, the hand controls become operational.  When the operator decides to get out of the 85XT, the operator's manual instructs that one should turn off the engine before exiting the machine.  There is also a label on the inside of the cab which has four bullet points of instructions to follow before leaving the cab.  Those instructions are to 1) lower the lift arm or engage the lift lock; 2) shut off the engine; 3) raise the seat bar; and 4) move the loader controls until locked.  (Trial Tr. vol. 2, 75-77, Jan. 7, 2008.)  By raising the seat bar and ensuring the controls are in neutral, according to Defendant, the operator ensures that the safety interlock mechanism is in place and the lift arms will not rise.  If the controls are shifted off-center before the seat bar is raised, however, raising the seat bar alone will not lock them out.  They will continue to be operational until they are permitted to return to neutral, at which point they will be locked out and will not move until the seat bar is lowered again.

2

Mr. Clevenger had been plowing for a short time when he felt the need to use the bathroom. He raised the lap bar. He did not turn off the engine. He did not move the controls to ensure that they were in neutral and locked. He opened the cab door and pushed it outward. As he climbed over the controls and out the door, the lift arms of the 85XT began to rise. The arms made contact with the bottom of the door and twisted the door behind Mr. Clevenger, trapping his left arm between the top of the door and the roof of the cab. It squeezed so tightly that he could not free himself. After he yelled for help for some time, Mr. Clevenger's family found him and managed to free him. They bound his arm with a tourniquet before he was air lifted to the hospital.

The pressure severed much of Mr. Clevenger's left triceps from his arm. An attempt to restore strength to the triceps area via a muscle graft from his back was unsuccessful. He does not have much use of his left arm.

Plaintiffs' theory of the case was that the 85XT was defectively designed. Slight pressure on the left hand control would not cause the lift arms to rise, but it would prevent the control from locking. The seat bar could be raised and then, by shifting to higher throttle, the lift arms would move, on occasion, without added pressure on the control. (Trial Tr. vol. 3, 58, Jan. 8, 2008.) Further, when the control is only slightly deflected, there is very little spring pressure to bring the control back to center. (*Id.* at 30.) Plaintiffs argued that the interlock should have operated to disallow movement of the arms of the 85XT as soon as the operator either raised the seat bar or stood up from the seat in the cab. In the alternative, or additionally, Case should have added a light or a buzzer that would sound to inform the operator that the interlock system either was or was not engaged.

3

Defendant submitted that the 85XT was not defectively designed. Instead, before Mr. Clevenger raised the seat bar, his left leg prevented the left hand control from centering and locking out. He failed to turn off the engine and to check the controls to ensure that they were locked. He maintained pressure on the left hand control and, as he was getting out of the machine, his body pushed the lever further, which caused the arms to rise. Once his body released the pressure on the lever, it sprang back to center and locked out. The arms stopped rising.

### B.   Procedural History

Plaintiffs commenced suit on May 17, 2006. (Doc. 1.) They amended their complaint on June 13, 2006. (Doc. 5.) After Defendant's motion for summary judgment was denied on December 6, 2007 (Doc. 58), the case proceeded to trial. A jury trial was held on January 4 and 7-9, 2008. The jury returned a verdict for Defendant. Plaintiffs timely filed the instant motion for new trial. (Doc. 108.) Briefing is complete and the motion is ripe for disposition.

## II.        Legal Standard—Motion for New Trial

A motion for a new trial is governed by Federal Rule of Civil Procedure 59. Under this rule, in the case of a jury trial, "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial . . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." Fed. R. Civ.

P. 61.  Thus, the inquiry is two-fold: 1) whether there was trial error and 2) whether the error affected a party's substantial rights.  *See Bhaya v. Westinghouse Elec. Corp.*, 709 F. Supp. 600, 601 (E.D. Pa. 1989).  When a motion for a new trial is based on a prejudicial error of law, the court has broad discretion to order a new trial.  *Klein v. Hollings*, 992 F.2d 1285, 1289-90 (3d Cir. 1993).

III.     **Discussion**

      Plaintiffs claim numerous errors in the court's interpretation and application of Pennsylvania law of strict products liability.  The jury reached only the threshold question on the verdict form and found that the 85XT was not defective as designed.  (*See* Doc. 99).  Thus, the court will address Plaintiffs' errors assigned to that topic only.[1]  The discussion begins by setting forth the substantive law governing this case and its applicability at trial.  With that basis, the court next turns to the evidentiary questions presented.

---

[1]  Because the jury did not reach the questions of causation or assumption of the risk (Doc. 99), any error, if there was error, in instructing the jury or admitting or excluding evidence on either topic was harmless.  *Leizerowski v. E. Freightways, Inc.*, 514 F.2d 487, 492 (3d Cir. 1975); *Farra v. Stanley-Bostitch, Inc.*, 838 F. Supp. 1021, 1032 (E.D. Pa. 1993); 11 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure § 2885 (admission or exclusion of evidence) & § 2886 (jury instructions) (2008).

A.  **Applicable Substantive Law**

Section 402A of the Restatement (2d) of Torts was adopted as law by the Pennsylvania Supreme Court in *Webb v. Zern*, 220 A.2d 853, 854 (Pa. 1966).[2]  It states:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>> (a) the seller is engaged in the business of selling such a product, and
>> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although
>> (a) the seller has exercised all possible care in the preparation and sale of his product, and
>> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (2d) of Torts § 402A.  The central question presented by this case was whether the skid steer loader was "in a defective condition."  Plaintiffs alleged that the design of the 85XT rendered it defective.

A product is "in a defective condition" when "the product left the supplier's control lacking any element necessary to make it safe for *its intended use* or possessing any feature that renders it unsafe for *the intended use*."  *Azzarello v. Black Bros. Co., Inc.*, 391 A.2d 1020, 1027 (Pa. 1978) (emphasis added); *accord Pa. Dep't of Gen. Servs. v. U.S. Mineral Prods. Co.*, 898 A.2d 590, 600 (Pa. 2006);

---

[2]  In this diversity action, the court looks to the substantive law of Pennsylvania to determine the rights and obligations of the parties.  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 77-78 (1938).  The Pennsylvania Supreme Court is the best authority on Pennsylvania law, but when the Supreme Court has not issued a clear pronouncement in a particular area, a federal district court "must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data" to determine what the law is.  *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 661, 663 (3d Cir. 1980).  Opinions from inferior Pennsylvania courts are not controlling, but are entitled to significant weight when there is no indication that the Pennsylvania Supreme Court would rule otherwise.  *State Farm Mut. Auto. Ins. Co. v. Rosenthal*, 484 F.3d 251, 253 (3d Cir. 2007).

*Phillips v. Cricket Lighters*, 841 A.2d 1000, 1005 (2003) (plurality); *Berkebile v. Brantly Helicopter Corp.*, 337 A.2d 893, 898 (1975).  This statement of the law in *Azzarello* leads immediately to these questions: what is the intended use of a product and how may that use be proved?  For some time, inferior Pennsylvania courts and federal courts applying Pennsylvania law held that the intended use of a product is a use that could have been reasonably foreseeable to the manufacturer.  *E.g., Parks v. AlliedSignal, Inc.*, 113 F.3d 1327, 1331 (3d Cir. 1997) ("The concept of foreseeability is relevant to strict products liability cases for the purpose of determining whether the use that was made of a product at the time of the accident was one that the manufacturer could have reasonably anticipated."); *Metzgar v. Playskool, Inc.*, 30 F.3d 459, 465 (3d Cir. 1994) ("[A]lthough foreseeability is not a term that should be associated with strict liability, the concept, to the extent it implies an objective test, is not entirely foreign to a strict liability analysis . . . ."); *Burch v. Sears, Roebuck & Co.*, 467 A.2d 615, 619 (Pa. Super. Ct. 1983) ("[a]n allegedly abnormal use will negate liability . . . only if [the use] was not reasonably foreseeable").

In *Pennsylvania Department of General Services v. U.S. Mineral Products*, the Pennsylvania Supreme Court expressly declined to follow this approach.  The court recognized the theoretical reasonableness of the precedent which supported the argument "that the overall concept of intended use should include all reasonably foreseeable uses and/or occurrences."  898 A.2d at 603.  But the court held that "a manufacturer can be deemed liable only for harm that occurs in connection with a product's intended use by an intended user; the general rule is that there is no strict liability in Pennsylvania relative to non-intended uses even where

7

foreseeable by a manufacturer." *Id.* at 601; *accord Phillips*, 841 A.2d at 1007 ("a manufacturer will not be held strictly liable for failing to design a product that was safe for use by any reasonably foreseeable user"); *see also Berrier v. Simplicity Mfg., Inc.*, No. 05-3621, 2008 WL 538912, at *3 (3d Cir. Jan. 17, 2008); *Opshinsky v. Wing Enters., Inc.*, No. 3:CV-05-1901, 2007 WL 108720, at *4 (M.D. Pa. Jan. 12, 2007). This statement of the law is consistent with prior decisions from that court holding that "foreseeability considerations have no place" in products liability actions. *U.S. Mineral Prods.*, 898 A.2d at 601; *accord Phillips*, 841 A.2d at 1007; *Kimco Dev't Corp. v. Michael D's Carpet Outlets*, 637 A.2d 603, 606 (1993). In spite of the reasoned criticism of this approach, *see Phillips*, 841 A.2d at 1013-23 (Saylor, J., concurring), this court is constrained to follow it.

> The first question appears to be answered. The intended use of a product is not any foreseeable use of a product, but the manufacturer's actual intended use of the product. The second issue remains: how to determine the manufacturer's intended use. Instructions for how to use a product are found in the owner's manual, a proper source from which to discern a manufacturer's intent. It is the primary and most direct source of information from the manufacturer about the use and maintenance of any product. *C.f. Moyer v. United Dominion Indus. Inc.*, 473 F.3d 532, 543 (3d Cir. 2007) (evidence of misuse and inadequate maintenance improperly excluded from trial). In *Zeger v. Joseph Rhodes, Ltd.*, 797 F. Supp. 395 (M.D. Pa. 1992), the plaintiff filed suit against the manufacturer of a sheet metal bending machine for an injury sustained while attempting to calibrate the machine's back gauges. Because calibrating the gauges "was specified in the routine maintenance instructions contained in a manual provided" by the manufacturer, the

court found that the plaintiff was using the machine as the manufacturer intended. *Id.* at 399.

Similarly, a manufacturer communicates its intent as to the way in which its product should be used by placing warning labels and instructions on the product itself.  In *Opshinsky v. Wing Enterprises, Inc.*, the warning label on a ladder was the text used to discern the manner in which the manufacturer intended the ladder to be used.  2007 WL 108720, at *5.  Such warnings are often necessary to determine whether a product is safe for its intended use.  *Berkebile*, 337 A.2d at 902; *Kalinowski v. E.I. Du Pont De Nemours & Co.*, 851 F. Supp. 149, 154 (E.D. Pa. 1994).  The safe or unsafe design of a product may turn on the nature of warnings thereon.  *See Metzgar*, 30 F.3d at 465; *Opshinsky*, 2007 WL 108720, at *4; *Gigus v. Giles & Ransome, Inc.*, 868 A.2d 459, 462 (Pa. Super. Ct. 2005).  "[T]he law presumes that warnings will be obeyed."  *Davis v. Berwind Corp.*, 690 A.2d 186, 190 (Pa. 1997); *see* Comment j of § 402A, Restatement (2d) of Torts.  It follows that warnings are appropriate indicia of the manufacturer's intent on how a product should be used.

The foregoing is the law that this court applied in admitting and excluding evidence throughout trial and in the jury instructions.  It is an accurate statement of Pennsylvania law.  There was no prejudicial error of law requiring a new trial.

## B.    Evidentiary Questions

Plaintiffs argue that this court erred in admitting certain video clips, in precluding Plaintiffs' proffered accident reports, and by admitting evidence of

industry standards for the manufacture of skid steer loaders.[3]  The court will address each argument in turn, but first sets forth the preliminary considerations for determining the admissibility of evidence.

Under Federal Rule of Evidence 402, "[a]ll relevant evidence is admissible" except as otherwise provided by the United States Constitution, laws of the United States, and other rules of evidence or procedure.  Concomitantly, "[e]vidence which is not relevant is not admissible."  *Id.*  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence."  Fed. R. Evid. 401.

Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice," among other considerations.  Fed. R. Evid. 403.  Evidence that is unfairly prejudicial is not evidence that is simply detrimental to one party's case.  *Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980).  Instead, it is evidence that has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one," Fed. R. Evid. 403 advisory committee's note, or "otherwise may cause a jury to base its decision on something other than the established propositions in the case."  *Carter*, 617 F.2d at 972 (quotation omitted).

---

[3]  "The substantive components of Pennsylvania products liability law are critical in determining the relevance and probative value of the evidence that was offered at trial." *Forrest v. Beloit Corp.*, 424 F.3d 344, 358 n.9 (3d Cir. 2005) (quotation omitted).  But as for the procedure for determining relevance, probative value, and prejudice, this court will apply the Federal Rules of Evidence. *See id.* at 354.

1. **Video Clips**

There were two video clips offered into evidence at trial; both were properly admitted.  Both showed Defendant's expert, Gary Stromberg, behind the controls of an 85XT used at Defendant's plant in Wichita, Kansas.  The first clip, unchallenged on this motion, features Stromberg demonstrating how an 85XT moves in response to its controls.  In the second video clip, at low throttle, Stromberg reaches under the lap bar with his left hand to push the left control—the one that raises and lowers the arms of the 85XT.  The lift arms rise.  Holding the control off-center, Stromberg raises the lap bar.  The arms continue to rise. Stromberg releases pressure on the control, it springs back to center, and the lift arms stop.  He pushes and hits the control, which does not move.  Neither do the lift arms.  He lowers the lap bar, then pushes the control again.  The lift arms lower. Stromberg repeats the demonstration in low throttle, then twice again at high throttle.  The video was offered to show that the control lever springs back to center once the pressure keeping it off-center is released.  Plaintiffs claim that admission of the video was error requiring a new trial because 1) it was not sufficiently similar to Mr. Clevenger's accident; 2) its contents are "directly contradictory to statements by Mr. Stromberg in his deposition;" 3) it did not reflect Plaintiffs' theory of the case; and 4) Plaintiffs did not have adequate notice of the demonstration being filmed. (Doc. 110 at 25-26.)

Taking Plaintiffs' arguments in turn, they correctly cite *Leonard v. Nichols Homeshield, Inc.*, 557 A.2d 743, 745 (Pa. Super. Ct. 1989), for the proposition that any visual re-enactment of an accident must display conditions "sufficiently similar to the event in question to throw light on a material point in

controversy and to assist the jury in arriving at the truth rather than to confuse the jury or prejudice the other party." The video clip at issue here was not, however, a re-enactment of Mr. Clevenger's accident. It was clearly and repeatedly stated to the jury, by counsel and by the court, that the events in the video did not and were not meant to recreate the conditions of the accident. (*See* Trial Tr. vol. 2, 155-168.) Instead, the video was meant to illustrate Stromberg's testimony as to the use and function of the 85XT. *Leonard* itself recognized the distinction between a re-enactment and a demonstration of the general operation of a product. 557 A.2d at 747. Other courts recognize the same distinction. *Jackson v. Spagnola*, 503 A.2d 944, 946-47 (Pa. Super. Ct. 1986); *see also Johnson v. Matlock*, 771 F.2d 1432, 1434 (10th Cir. 1985); *Russo v. Mazda Motor Corp.*, Civ. A. No. 89-7995, 1992 WL 309630, at *1-3 (E.D. Pa. Oct. 19, 1992); *Zurzolo v. Gen. Motors Corp.*, 69 F.R.D. 469, 473 (E.D. Pa. 1975). Stromberg testified about the relevant design and operation of the 85XT and, in particular, rebutted Plaintiffs' theory of design defect. The second video clip rendered his testimony more comprehensible to the jury by providing a visual illustration of aspects thereof. *See* 2 Kenneth S. Broun, McCormick on Evidence § 214 (6th ed. 2006). In that way, it was relevant and probative.

The video clip was not unfairly prejudicial to Plaintiffs. While it was detrimental to Plaintiffs' case because it illustrated propositions set forth by Defendant, it did not create the danger that the jury would render a verdict based on an improper basis. Plaintiffs proffered their own expert, Clifford Anderson, and elicited a substantial amount of testimony as to his theory of why the design of the 85XT was defective. His testimony was illustrated by diagrams, both produced by

Case and drawn by Anderson on the witness stand.  Plaintiffs' counsel thoroughly cross-examined Stromberg on all aspects of both the demonstration and his tests of the Plaintiffs' 85XT.  (Trial Tr. vol. 3, 158-67.)  The objections Plaintiffs now make to the video clip were ably addressed on cross-examination, and go to the weight of the video evidence, not its admissibility.

Turning to Plaintiff's remaining arguments, Stromberg's cross-examination was also the place to highlight any aspects of the demonstration that were "directly contradictory" to statements he made in his deposition, a factor that also goes to the weight of the evidence but not the admissibility.  Plaintiffs were entitled to submit a video demonstration that would have supported their theory of the case; it is of no moment that Defendant's video did not.  Still further, Plaintiffs were well aware that Defendant intended to proffer the video clip as an exhibit.  It was proposed for use as an exhibit prior to the pretrial conference, held on December 20, 2007.  This court ruled that it was admissible on December 27, 2007.  Trial began on January 4, 2008.  Plaintiffs were afforded at least fifteen days' notice that the demonstration might be used as an exhibit.  That time is more than sufficient to prepare rebuttal.  *See Jackson*, 503 A.2d at 947 (two days' notice of intent to use a film as an exhibit was sufficient).  Defendant was not required to inform Plaintiffs when the demonstration was being filmed.  Plaintiffs' arguments regarding the admissibility of the second video clip are unavailing; it was properly admitted into evidence.

### 2.    Accident Reports

Plaintiffs sought to admit certain accident reports, produced in discovery by Case, of other situations in which the arms of an 85XT lifted after the

13

seat bar was raised and the operator had left the seat.  Such evidence is relevant to this dispute, but is inadmissible hearsay.  "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial . . . , offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  Hearsay is not admissible except as provided by the Rules of Evidence or other rules prescribed by the Supreme Court pursuant to Congressional authority.  Fed. R. Evid. 802.  A document containing multiple levels of hearsay is admissible only if each level of hearsay is independently admissible.  Fed. R. Evid. 805; *see In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 376 (3d Cir. 2004).

The evidence sought for admission is hearsay within hearsay.  The first level of hearsay is the accident report as a whole.  The court presumes the parties' familiarity with the business records exception that would render these documents admissible if no other hearsay evidence existed within the documents.  Fed. R. Evid. 803(6).  The accident reports do, however, contain an additional level of hearsay because the persons who filled out the reports in the course of their duties were memorializing out of court statements by others, which statements were offered in this trial for the truth of the matters asserted therein—as evidence that the 85XT demonstrated the alleged defect in other situations.  *See John McShain, Inc. v. Cessna Aircraft Co.*, 563 F.2d 632, 636 (3d Cir. 1977).  No exception to or exclusion from the rule against hearsay renders these statements admissible.

To the extent that these reports were offered to show simply that Defendant had notice of the defect alleged, *see Majdic v. Cincinnati Machine Co.*, 537 A.2d 334, 340 (Pa. Super. Ct. 1988), they were irrelevant.  Each accident report was submitted to Defendant after the subject 85XT left its control and was

14

purchased by the Clevengers.  Accordingly, the accident reports were properly
excluded.

### 3. **Industry Standards**

Testimonial evidence regarding industry standards for the design of
skid steer loaders was admitted at trial, but allowing it was not prejudicial error.[4]
The Pennsylvania Supreme Court has held that evidence of industry standards goes
to the reasonableness of a manufacturer's conduct in designing the product.  *Lewis v.
Coffing Hoist Div., Duff-Norton*, 528 A.2d 590, 594 (Pa. 1987) (citing *Holloway v.
J.B. Sys., Ltd*, 609 F.2d 1069, 1073 (3d Cir. 1979)).  Because reasonableness, as a
negligence concept, is not relevant to a strict products liability suit, admitting
evidence of industry standards is error.  *Id.*  But "where a plaintiff introduces
evidence of industry standards in his case-in-chief, the defense is entitled to present
evidence in opposition."  *Daddona v. Thind*, 891 A.2d 786, 807 (Pa. Commw. Ct.
2006); *accord Markovitch v. Bell Helicopter Textron, Inc.*, 805 F. Supp. 1231, 1239-
40 (E.D. Pa. 1992).

During Plaintiffs' case in chief, Anderson described why he concluded
that the interlock system in the 85XT is defective.  He compared the interlock in the
85XT to the standards promulgated by the Occupational Safety and Health
Administration.  Those standards "say you should put guards and interlocks on
machinery, but the guards and interlocks cannot become a safety hazard in and of
themselves.  This safety lock has become a hazard because the spool is held open."
(Trial Tr. vol. 3, 35.)  Further, Anderson testified that the automatic shut-off switch

---

[4] Plaintiffs did not identify the specific instances when such testimony was introduced.  The
following discussion results from the court's own review of the transcript and its assessment of
Plaintiffs' grounds for error.

that he proposed as an alternative design for the 85XT is "commonly found on all types of equipment.  I mentioned mowers.  Other ski[d] steer loaders."  (*Id.* at 42-43.)  On cross examination, counsel for Defendant asked whether Anderson had found any engineering standard or recommended practice with which the design of the 85XT did not comply; Anderson answered that he had not.  (*Id.* at 82.)  Counsel asked again, "[e]very applicable standard was satisfied by the design of the 85XT, true?"  (*Id.*)  Anderson responded, "[t]hat's true."  (*Id.*)  Plaintiffs did not object to either question by Defendant.

Gary Stromberg, Defendant's expert, testified immediately after Anderson and during Defendant's case in chief.  Defense counsel asked whether he knew of any skid steer loader manufacturer that would have designed the product such that the engine would shut off if the operator raised the seat bar and exited the machine.  (*Id.* at 145.)  Plaintiffs' counsel objected to the introduction of the standards or practices used by other manufacturers.  The objection was overruled and Stromberg testified that, "[a]s far as Case brand skid steers and other skid steer manufacturers, none of them have the feature of, when the seat bar is raised, when you exit the machine, that it will kill the engine."  (*Id.*)  When asked why, Stromberg explained that they do not incorporate that feature because certain attachments, like a backhoe, are designed to work with the operator out of the main seat inside the cab of the 85XT.  (*Id.* at 146.)  Later, Defense counsel asked whether "any of the other skid steer loader manufacturers that you became acquainted with through AEM, the trade group" offered "skid steer loaders which, like the XT series, require that the controls be in neutral for them to be properly locked out."  (*Id.* at 147.)  Plaintiffs did not object.  Stromberg testified that they did.

16

The testimony in this trial followed the path of the trials in *Daddona* and *Markovitch*.  Plaintiffs injected the concept of industry safety standards during their case in chief.  Defendant permissibly rebutted the testimony on cross examination and in the testimony it proffered.  Even if the admission of certain of this testimony was admitted in error, the error did not affect Plaintiffs' substantive rights.  In *Holloway*, the Third Circuit held that admitting testimony on industry standards did not prejudice the plaintiff because "other testimony was properly limited to issues of strict liability" and the jury instructions emphasized that the defendant could be held liable "without negligence or fault on its part."  609 F.2d at 1073.  The testimony regarding industry standards was minimal in this case.  Further, the jury was instructed, as in *Holloway*, that strict liability is properly imposed if

> there was a defect in the product when it left the manufacturer's control and that the defect was a proximate cause of [Mr. Clevenger's] injury. Such liability is imposed even if the manufacturer has taken all possible care in the preparation and sale of the product. . . .  The product must be provided with every element necessary to make it safe for its intended use and without any condition that makes it unsafe for its intended use.

(Trial Tr. vol. 4, 95-96, Jan. 9, 2008.)  Accordingly, the jury knew that if it found that the 85XT was defectively designed, Defendant would be liable regardless of whether it exercised due care or acted reasonably.  If there was error in admitting testimony regarding industry standards, it did not prejudice Plaintiffs' substantive rights.

17

**IV.**         <u>**Conclusion**</u>

For all of the foregoing reasons, Plaintiffs' motion for new trial will be denied.  An appropriate order will follow.


                                        s/Sylvia H. Rambo
                                        SYLVIA H. RAMBO
                                        United States District Judge

Dated:  June 9, 2008.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN E. CLEVENGER and**<br>**CAROL L. CLEVENGER,** | : | **No. 1:06-CV-1006** |
| | : | |
| **Plaintiffs** | : | **JUDGE SYLVIA H. RAMBO** |
| | : | |
| **v.** | : | |
| | : | |
| **CNH AMERICA, LLC,** | : | |
| | : | |
| **Defendant** | : | |

**O R D E R**

In accordance with the accompanying memorandum of law, **IT IS HEREBY ORDERED THAT** Plaintiffs' motion for new trial (Doc. 108) is **DENIED**.  The Clerk of court shall close this case.


                                    s/Sylvia H. Rambo
                                    SYLVIA H. RAMBO
                                    United States District Judge

Dated:  June 9, 2008.